UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**ALICE KOPACSI**

       **Plaintiff,**            **CIVIL ACTION NO. 05-CV-60257-DT**

       vs.                     **DISTRICT JUDGE JOHN CORBETT O'MEARA**

**COMMISSIONER OF**       **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

# REPORT AND RECOMMENDATION

## I.   RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 16), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 14), and that Plaintiff's Complaint be **DISMISSED**.

## II.   PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Alice Kopacsi filed an application for Disability Insurance Benefits (DIB) in March 2002. (Tr. 61-63). She alleged she had been disabled since December 2000 due to asthma, hyperthyroidism, shortness of breath, and intolerance to dirt and dust. (Tr. 61-63, 72, 74, 347). Plaintiff's claims were initially denied in July 2002. (Tr. 43-48). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 51). A hearing took place before ALJ Douglas N. Jones on May 14, 2004. (Tr. 345-372). Plaintiff was represented by an attorney at the hearing. (Tr. 49-50, 52-54, 345). The ALJ denied Plaintiff's claims in an opinion issued on July 22, 2004. (Tr. 118-28). The

Appeals Council denied review of the ALJ's decision on November 25, 2005 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 6-13). Plaintiff appealed the denial of her claims to this Court, and both parties have filed motions for summary judgment.

### III.     MEDICAL HISTORY[1]

The medical records show that Plaintiff met with Dr. Kang Kwon, a psychiatrist, on a monthly basis for the purposes of medicine review. The sessions lasted 15 minutes each. In April 2001 Plaintiff stated that her daughter caused her stress because she was not respectful. She indicated that she was sleeping okay. (Tr. 137). In May 2001 Plaintiff told Dr. Kwon that her daughter was better behaved and would be moving in with her. Plaintiff's sleep was still okay. Plaintiff stated that she avoided her neighbors but went to AA meetings for socialization. (Tr. 135-36). Dr. Kwon noted in September 2001 that Plaintiff was sleeping well and that her daughter was now living with her. (Tr. 131). In October 2001 Plaintiff reported that her temper was bad but that she was attending NA and AA meetings. (Tr. 129). Plaintiff stated in December 2001 that she was having mood swings and that she was arguing with her husband. (Tr. 127). By April 2002 Plaintiff reported that she was having anxiety, was not sleeping well, and was getting up late. (Tr. 125).

On May 3, 2002 Plaintiff's physician, Dr. Christine Elsholz, indicated that Plaintiff had bipolar disease but Dr. Elsholz did not know whether Plaintiff was still seeing a psychiatrist. She also noted that Plaintiff exhibited "drug seeking behavior." (Tr. 245).

On May 29, 2002 Plaintiff was examined by a consultative psychiatrist, Dr. Gordon R. Forrer. (Tr. 158-162). Plaintiff reported no difficulties sleeping to Dr. Forrer. She stated that she had a good

---

[1]     This appeal concerns the appropriateness of the ALJ's RFC finding as it pertains to Plaintiff's mental limitations. Therefore, only medical records relevant to this issue are discussed herein.

relationship with her father, mother (when alive), and two sisters. (Tr. 158). Plaintiff also told Dr. Forrer that she had no past or present problems with alcohol or street drugs and that she did not smoke. (Tr. 159). Dr. Forrer's notes indicate that Plaintiff was not depressed or suicidal although she had fleeting suicidal thoughts in the past. Plaintiff reported that she socialized and played cards with her friends. She also liked to read and experienced no difficulty with concentration or comprehension. (Tr. 160). Plaintiff further stated that she shared the household chores with her husband. She shopped for food and other necessities as required. Plaintiff took care of her own personal care needs without limitation. (Tr. 159). Plaintiff reported that she was currently spending her time caring for her home and family, including her father who was convalescing at her home after surgery. *Id.*

Dr. Forrer observed that Plaintiff was neatly and appropriately groomed. (Tr. 160). She displayed no outward signs of anxiety. He described her as serious minded with a "few good quality emphatic smiling responses." *Id.* Dr. Forrer noted that Plaintiff had a good grasp of her life circumstances. Her mood was overall unremarkable with no irritability, hostility or emotional lability. Plaintiff's affect was adequate and she had appropriate thought content. She was oriented to time, place, and person. Dr. Forrer concluded that Plaintiff had no psychiatric illness and that she did have an adequate level of psychological functioning. He opined that Plaintiff would suffer any adverse changes in her life due to her mental condition for the next twelve months. (Tr. 161).

A Psychiatric Review Technique ("PRT") form was completed by a consulting psychologist on June 20, 2002. (Tr. 163-76). The psychologist concluded that Plaintiff had a non-severe affective disorder, specifically bi-polar disorder. (Tr. 163, 166). He concluded that Plaintiff had no restrictions of activities of daily living or episodes of decompensation and only mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 173).

Plaintiff was admitted to the emergency room on June 27, 2002 complaining of an inability to sleep. (Tr. 179-223). She had been taking diet pills and had not slept in 36 hours. (Tr. 179, 186). Plaintiff also had erythema, which was very itchy. (Tr. 186). Plaintiff stated that she was also having paranoid thoughts and was feeling very lethargic. (Tr. 179). Plaintiff denied drug use but toxicology reports were positive for amphetamines, cocaine, marijuana, and benzodiazepines. (Tr. 179-80). Dr. Kwon noted that Plaintiff was having difficulty staying awake and that Plaintiff believed people were watching and following her. Plaintiff's affect was blunted, her mood depressed, and her judgment impaired. (Tr. 186). Dr. Kwon diagnosed Plaintiff as having a delirious state due to a drug overdose and mixed bi-polar disorder. *Id.* He assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 33.[2] *Id.*

Plaintiff was admitted to the emergency room in December 2002 following a fight with her husband. She reported feeling anxious, hopeless, and helpless. Plaintiff had also taken a lot of diet pills, was not sleeping, and was reportedly hallucinating. (Tr. 232). Tests were positive for amphetamines, marijuana, and PCP in Plaintiff's system. (Tr. 238). Plaintiff was treated and released as stable the same day. (Tr. 233).

Dr. Kwon's progress notes from January to May 2003 include Plaintiff's report that she had "bad" nerves. (Tr. 312). Plaintiff was baby-sitting and cleaning houses, getting "money under the table." Plaintiff was also sleeping and eating okay. (Tr. 312-313).

---

[2] The Global Assessment of Functioning (GAF) is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed. 2000) 32. ("DSM-IV"). A GAF of 31-40 is extremely low, and "indicates [s]ome impairment in reality testing or communication · · · [or] major impairment in reality testing or communication · · · [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

Plaintiff was seen again at the emergency room on June 6, 2003 complaining of agitation. She had recently had an argument with her daughter because her daughter had gotten her fired from a baby-sitting job, which she did three nights a week. (Tr. 260, 268). Plaintiff stated that her liver enzyme level was high so she was not taking the medication for her mental condition. *Id.* Plaintiff also reported a history of drug and alcohol abuse. She stated that she was attending Insight but had missed three days. Consequently, she was discharged from the program with a recommendation that she seek residential drug treatment. (Tr. 260). It was noted that Plaintiff was alert and well-oriented. Her speech rate and volume were increased and she had flight of ideas. Plaintiff's affect was labile and her mood somewhat agitated. She was a assigned a GAF score of 41.[3] (Tr. 261). Plaintiff also reported a previous suicide attempt. (Tr. 272). Plaintiff was subsequently admitted into a day treatment program for an estimated two-week stay. *(Id.;* Tr. 274).

Notes from Plaintiff's treatment program include Plaintiff's admission that she had not always been compliant with her medication because she knew she could not mix them with street drugs. (Tr. 285). She also reported that she had not always been honest with Dr. Kwon. *Id.* Plaintiff said that she had last used cocaine 6 months prior and had recently started smoking cigarettes. (Tr. 286). Plaintiff was discharged from the program on June 17, 2003. (Tr. 263).

In August 2003 Dr. Kwon noted that Plaintiff "does not seem to be compliant with her medication." (Tr. 309). He also noted no incongruent thought content or unusual behavior or speech. *Id.*

---

[3] A GAF of 41 to 50 suggests that the patient has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

-5-

Plaintiff was admitted to the emergency room in March 2004 due to reported anxiety and chest pain after having smoked crack cocaine. (Tr. 320-334). Plaintiff was fed and instructed to stop using crack. She was subsequently released with a referral for substance abuse treatment. (Tr. 326-27).

## IV. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was born in October 1958. She had completed the tenth grade in high school and had obtained her GED. (Tr. 350). Plaintiff testified that she stopped working in January 1999 due to her asthma and her bipolar disorder. (Tr. 352). She also told the ALJ that had been seeing Dr. Kwon, a psychologist, for years but that he had gotten angry at her for missing appointments. Consequently, Plaintiff began treatment with Dr. Matthews in April 2004. (Tr. 356). Dr. Matthews had prescribed a new anti-depressant but it was too early to tell if the medication was effective. (Tr. 359). Plaintiff also testified that she was hospitalized several times. On one occasion, she had gotten into a fight with her ex-husband and was acting "psychotic". (Tr. 357). She admitted to the ALJ that she still drank alcohol and had consumed a pint of vodka three weeks prior to the hearing. (Tr. 361). Plaintiff told ALJ that had not yet started AA again because she was too tired to get out of bed. She reasoned that her fatigue was caused by her hepitis C, stress, and depression. (Tr. 358). Plaintiff also stated that her medical problems had caused weight loss and had affected her sleeping pattern by making her stay either wide awake or asleep for two to three days. (Tr. 351, 362).

When asked about her activities of daily living, Plaintiff testified that she spends most of the day in bed before getting up to clean dishes. She stated that her thoughts were "not very good" because she felt overwhelmed and worried and could not remember things. Plaintiff also told the ALJ that she had a driver's license and drove maybe once or twice per week to go to the store or Taco Bell (Tr. 354-55).

Plaintiff also indicated that in June 2003 her sister and boyfriend had moved in with her for about a year. Plaintiff would watch their six or seven year old son while they were at work. (Tr. 352-53).

### B. Vocational Expert's Testimony

Ms. Pauline McEachin, a certified rehabilitation counselor, testified as a vocational expert at the hearing. (Tr. 56, 366-71). The ALJ asked Ms. McEachin about the type and number of jobs available in Michigan's lower peninsula for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of performing unskilled, light or sedentary work with the following limitations: (1) only occasional bending at the waist, crawling, or climbing of stairs; (2) no climbing of ladders; (3) no exposure to unprotected heights, hazardous or uncovered moving machinery, exposure to dust, fumes, or other air-bourne pollutants without the use of a respirator mask to provide clean air, or exposure to very cold or hot temperatures or very humid or wet working environments; and (4) no detailed instructions, extended periods of concentration, meaning no more than 10 minutes to mentally understand and actively process any given task, and only occasional interaction with co-workers and members of the general public. (Tr. 367-68).

Ms. McEachin testified that the hypothetical individual described by the ALJ could perform a number of jobs at the light level, including 2,200 visual inspection jobs, 6,000 assembler positions, and 8,000 inspector jobs, and at the sedentary level, including 2,000 video surveillance monitor jobs, 2,200 visual inspection jobs, and 1,500 machine operator jobs. (Tr. 368).

### V. THE ALJ'S FINDINGS

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 21, 2000. (Tr. 22). He further found that Plaintiff had the following "severe" impairments: a history of asthma, hypothyroidism, hypertension, degenerative disc disease of the cervical spine, hepatitis C (diagnosed in 2003), a history of seizures, status post hysterectomy

(1994), status post cholecystectomy (1988), bi-polar disorder, and a history of polysubstance abuse. (Tr. 24). However, the ALJ determined these impairments did not meet or medically equal any listed severe impairment. *Id.* The ALJ also surmised that Plaintiff could not perform her past relevant work but that she retained the RFC to perform unskilled, sedentary work that incorporated: (1) occasional bending at the waist, kneeling, crawling, and climbing stairs; (2) no climbing ladders; (3) no exposure to unprotected heights, hazardous machinery, constant wetness or high humidity, dust, fumes, or other air-bourne pollutants, or very hot or very cold temperatures; and (4) no detailed instructions, extended periods of concentration, and only occasional interaction with co-workers and members of the general public. (Tr. 24-25). Plaintiff's claim was denied because the ALJ determined that, based upon the testimony of Ms. McEachin, there were other jobs available in the economy for a person of Plaintiff's age, educational level, work experience, and RFC. (Tr. 26-27, 28). Furthermore, the ALJ determined that Plaintiff's allegations about her limitations were not totally credible. (Tr. 27).

## VI.  LAW AND ANALYSIS

### A.  STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts

in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.    FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational

expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C. ANALYSIS

Plaintiff asserts that the ALJ failed to properly account for the mental limitations caused by her bi-polar disorder into the hypothetical he posed to the VE. Therefore, Plaintiff reasons that the VE's testimony does not provide substantial evidence to support the ALJ's non-disability determination.

The Commissioner has prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A. The clinical findings are referred to as the "A" criteria. Thereafter, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area. Thus, the Commissioner must evaluate the activities of daily living and social functioning and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme. Limitations in a third area of concentration, persistence, or pace are rated on the same five-point scale. The fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c).

In applying the factors, the ALJ determined at step two that Plaintiff had bi-polar disorder ("A" criteria) and that her disorder caused her to have: (1) mild restrictions in her activities of daily

living; (2) moderate restrictions in maintaining social functioning; (3) moderate restrictions in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation lasting for extended periods ("B" criteria). (Tr. 25). Based upon these findings, the ALJ concluded that Plaintiff had a severe mental impairment. At step three, however, the ALJ concluded that Plaintiff's mental impairment did not meet or medically equal any listed impairment.

Consequently, the ALJ then properly determined Plaintiff's RFC. *See* 20 C.F.R.1520a(d)(3). The ALJ accounted for Plaintiff's mental limitations by confining her to unskilled work involving no detailed instructions and no extended periods of concentration, meaning no more than 10 minutes to mentally understand and actively process any given task. (Tr. 367-68). The ALJ also restricted Plaintiff to work that required only occasional interaction with co-workers and the general public. *Id.* At step five, the ALJ posed a hypothetical to the VE that incorporated his RFC finding.

The Court interprets Plaintiff's reference to her GAF scores as a passing attack on the ALJ's finding that her difficulties in maintaining concentration, persistence, or pace were moderate rather than marked. However, GAF scores do not have a direct correlation to the severity of a claimant's mental impairment. Therefore, a scale determination is not dispositive but is to be considered as part of the entirety of the relevant evidence. 65 Fed. Reg. 50746-01, 50764-65 (2000); *see also Kornecky v. Comm'r Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. 2006) (unpublished) (a GAF score may also "have little or no bearing on the subject's social and occupational functioning.").

Substantial evidence supports the ALJ's determination that Plaintiff's difficulties in maintaining concentration, persistence, or pace were moderate despite her low GAF scores. There is no "marked" limitation where the plaintiff has not shown that the mental impairments "seriously interfere with the ability to function independently, appropriately and effectively." *Foster v. Bowen,* 853 F.2d 488, 491 (6th Cir. 1988). Medical records from December 2000 (alleged onset date) to

June 2002 show that Plaintiff was only seeing Dr. Kwon for 15 minute sessions on a monthly basis for the purpose of refilling her prescriptions. Dr. Forrer concluded that Plaintiff had no psychiatric diagnosis at the time and that she demonstrated adequate psychological functioning. Plaintiff reported that she was able to play card games with her friends and could read books without any difficulties in concentration or comprehension. A PRT form filled out indicated that Plaintiff was not severely bi-polar and that Plaintiff had only mild difficulties in maintaining concentration, persistence, or pace.

The record shows that Plaintiff's condition deteriorated after June 2002 and Plaintiff was seen several times in the emergency room for issues related to her mental status. Following her admission to the day treatment program in June 2003, however, Plaintiff "appeared able to focus on the task at hand." (Tr. 284). Dr. Kwon's notes show that Plaintiff was cleaning houses and babysitting and that she was sleeping and eating well.

Furthermore, given the record, the ALJ reasonably concluded that Plaintiff's problems, and her corresponding low GAF scores, were not an indication of her overall level of functioning and would not be expected to last for 12 continuous months. Plaintiff was assigned a GAF score of 33 in June 2002 but it was following a illegal drug overdose. She did not require in-patient psychological follow up. (Tr. 208). In December 2002 Plaintiff was again in the emergency room after an argument with her husband and she had illegal drugs in her system. In June 2003 she was admitted to the emergency room following an argument with her daughter and she was not taking the medication for her mental condition. Plaintiff admitted that she was not compliant in taking her medication while also taking street drugs because she knew she could not mix them. Plaintiff was also not compliant with her mental health therapy. She was discharged from Insight for missed sessions, missed several sessions of her day treatment program in June 2003, and testified that Dr.

Kwon no longer treated her because of missed appointments. Given this evidence as a whole, the ALJ's findings are supported by substantial evidence.

Plaintiff also points to the ALJ's step two finding that Plaintiff had moderate limitations in maintaining concentration, persistence, or pace and argues that it is not fully incorporated within the ALJ's RFC finding and subsequent step five hypothetical question. (Pl.'s Mot. for Summ.J. at 10).

Plaintiff acknowledges that the ALJ was not required to use the "talismanic" language from his step two findings regarding Plaintiff's "moderate limitations in maintaining concentration, persistence, or pace" when fashioning his RFC and subsequent hypothetical. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). An ALJ's RFC assessment and corresponding hypothetical are sufficient if "[t]he ALJ went beyond [a] simple frequency assessment to develop a complete and accurate assessment of . . . [claimant's] mental impairment." *Id.* The RFC assessment is a highly individualized analysis dependent upon the facts of any given case. *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005).

Plaintiff does not specifically articulate how the ALJ's RFC finding and corresponding hypothetical are inadequate based upon the facts of this case. Rather, she suggests that by comparison to the RFCs and hypotheticals at issue in various other similar cases from this district and others, the inadequacies of the ALJ's findings in this case are apparent.

Plaintiff cites to cases where the ALJ made no effort to account for the claimant's limitations in concentration, persistence, or pace. *See Herriman v. Apfel*, 2000 WL 246598 *1 (E.D. Mich. 2000); *Thomzcek v. Chater*, 1996 WL 426247 *2-3 (E.D. Mich. 1996). However, the ALJ *did* account for Plaintiff's mental limitations here. The issue, however, is whether his accounting was sufficient. Therefore, these cases provide little guidance.

Plaintiff also relies upon cases in which the ALJs' RFCs and hypotheticals were found insufficient to account for the claimant's mental deficiencies. *See Bielat v. Comm'r of Soc. Sec.*, 267 F. Supp. 2d 698 (E.D. Mich. 2003) (holding that "unskilled sedentary work" with a "low" "emotional stress level" is not sufficient to accommodate a finding of "marked" limitation in ability to concentrate or persist at tasks); *Brooks v. Comm'r of Soc. Sec.*, 1999 WL 552663 *1, 5 (D. Or. 1999) (holding that "simple, non-complex work" is not sufficient to encompass claimant's deficiencies in concentration, persistence or pace that result in a failure to complete tasks in a timely manner)*;* and *Newton v. Chater*, 92 F.3d 688 (8th Cir.1996) (holding that a reference to "simple jobs" was not inclusive of deficiencies in concentration).

However, these cases are factually inapposite to the present case because the ALJ did not limit Plaintiff to just unskilled work with no detailed instructions. Rather, he specifically accounted for Plaintiff's moderate difficulties in maintaining concentration, persistence or pace by restricting her to work that did not require extended periods of concentration. Specifically, the ALJ defined this to mean work with tasks that would not require more than 10 minutes to mentally understand and actively process.

Plaintiff points to still other cases to support her proposition that despite any accommodation of her concentration difficulties, the ALJ's RFC finding and hypothetical are nevertheless faulty because they do not expressly incorporate a timeliness-related limitation. For example, in *McGuire v. Apfel*, 1999 WL 426035 at *15-16 (D. Or. 1999), the court held that "simple work" was an insufficient hypothetical because it did not "mention any problems regarding completion of tasks on time or the pace with which the person would work." The Court in *Smith v. Halter* distinguished the facts of its case from those in *McGuire* by finding that the ALJ's restriction against jobs with quotas sufficiently accounted for any of claimant's deficiencies in pace. *Smith*, 307

F.3d at 380. *See also Brachtel v.* Apfel, 132 F.3d 417, 420-21 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir. 1996) (both holding that deficiencies in pace adequately encompassed within hypothetical that precluded work which required completion of tasks at "more than the regular pace.")

However, these cases do not stand for the proposition that an ALJ must necessarily include a separate timeliness-related limitation into his hypothetical whenever a claimant is found to have moderate difficulties in concentration, persistence, or pace. Indeed, an ALJ's step two finding that Plaintiff has moderate difficulties in maintaining concentration, persistence, *or* pace is written in the disjunctive and does not mean that the ALJ found that Plaintiff was deficient in all three areas of functioning. *See Brachtel*, 132 F.3d at 421. As stated by the Court in *Bohn-Morton*, 389 F. Supp. 2d at 807:

> Thus, an individual who "often experiences deficiencies in concentration alone, but not persistence or pace, might be unable to perform complex or detailed work, yet still be capable of carrying out simple and complex rote tasks. Another individual in this same broad category, in contrast, might be more significantly limited as to the pace of work, so that she could perform even complex task so long as the quota was suitably low.

The focus remains, as previously stated, on the specific facts present in each case. Plaintiff points to no evidence in the record that suggests she had difficulties in maintaining persistence or pace as a result of her mental impairment. There is no opinion evidence which directs a finding that she suffered from an inability to complete tasks in a timely manner. Plaintiff testified that she was overwhelmed and worried and could not remember things but these limitations were sufficiently accommodated by the ALJ's hypothetical of a person who needed unskilled work with no detailed instructions and who could not engage in extended periods of concentration. Given the record, substantial evidence supports the ALJ's determination that Plaintiff's moderate difficulties in

maintaining concentration, persistence, or pace were adequately summarized by his RFC finding and subsequent hypothetical. [4]

Plaintiff also makes two additional cursory arguments in support of her request for remand. Neither of these arguments is addressed by Defendant.

Plaintiff first asserts that reversible error occurred because although the ALJ found her capable of performing sedentary work, he improperly defined such work as the ability to lift and carry up to 20 pounds occasionally. (Tr. 24, 27). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *See* 404.1567(a). The definition used by the ALJ is actually attributable to light work. *See* 20 C.F.R. 404.1567(b).

Plaintiff does not argue how, and this Court does not see why, such an alleged error impacts the ALJ's ultimate non-disability determination in this case. It is clear from the ALJ's opinion that he found Plaintiff capable of sedentary work as he relied upon the VE's testimony applicable to sedentary, not light, work. (Tr. 26, 368-69). Furthermore, even if the ALJ had found Plaintiff capable of light work, this error would have no effect because the VE also testified that a significant

---

[4] Plaintiff's citation to *Bankston v. Comm'r of Soc. Sec.*, 127 F.Supp.2d 820 (E.D. Mich. 2000) does not dictate a different result. In *Bankston*, the Court found that one who "often" suffers from difficulties in concentration, persistence, or pace, as used in the old regulations, implies a deficiency in concentration that can be quantified as 50% of the time on a linear scale and which may not be consistent with substantial gainful activity. *Id.* at 826-27. Plaintiff seeks to equate "moderate" as used in the current regulations with that of "often" because both terms fall on the same place in a five-point scale. However, there is no Sixth Circuit authority that holds the two are interchangeable such that the logic of *Bankston* has any clear application to this case. Furthermore, there is no such authority that defines "moderate" as meaning a 50% deficit. *See Butler-Wade v. Comm'r of Soc. Sec.*, 2005 WL 361530 *7-8 (E.D. Mich. 2005).

number of jobs exist in the regional economy for Plaintiff if she could perform light work. (Tr. 368).

Plaintiff also argues that the ALJ erred by not mentioning or evaluating the previous denial of her application for DIB issued December 20, 2000, citing to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) as well as the subsequent Acquiescence Ruling ("AR") 98-4(6).[5]

In *Drummond*, a claimant was denied disability benefits because it was determined that she was a "younger" worker as defined under the Social Security regulations who had the RFC to perform sedentary work. *Drummond*, 126 F.3d at 838. The claimant's subsequent application covering a different time period was also denied because the claimant, now a "person approaching advanced age" under the regulations, was determined to have the RFC to perform medium work. *Id.* at 839. Had the claimant only had the RFC to perform sedentary work, as previously determined, then a finding of disability would have been mandated. *Id.* The *Drummond* Court ultimately concluded that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d at 842.

Plaintiff filed a previous application for DIB in March 1999. ALJ William Musseman issued a written order denying her application on December 20, 2000 (the alleged onset date of Plaintiff's application which is at issue in this appeal). ALJ Musseman determined that Plaintiff had the RFC to perform a significant range of medium work. (Tr. 38). Specifically, he stated the following:

> The claimant has the following residual functional capacity: she has no physical limitations. However, she should avoid temperature extremes,

---

[5] In AR 98-4(6), the Commissioner acknowledges its acquiescence in the Sixth Circuit's opinion in *Drummond*.

>fumes, smoke, chemicals and dust. She retains the ability to handle one
>and two step instructions and should avoid complex tasks. She must
>have minimal supervision and should have no dealings with the general
>public and only occasional dealings with co-workers.

(Tr. 38).

Plaintiff does not cite to any cases that suggest that an ALJ must always discuss a claimant's previous application for disability benefits much less that the failure to do so is reversible error. Moreover, she offers no support for her conclusion that the ALJ's lack of discussion necessarily means that the ALJ did not consider this evidence.

More importantly, Plaintiff does not discuss how the principles of *Drummond* were misapplied in this case. The ALJ in the previous case determined that Plaintiff had the RFC to perform a significant range of medium work while the ALJ in the present case, after an examination of newly submitted evidence, deemed Plaintiff capable of performing a more restrictive range of sedentary work but was nevertheless still not disabled. This case is thus unlike *Drummond* in that ALJ Jones' altered RFC finding did not operate to deny Plaintiff benefits that she would have otherwise been entitled to receive.

Furthermore, the ALJ's RFC determination in the present case largely incorporates the prior ALJ's RFC determination. Although ALJ Musseman determined that Plaintiff retained the ability to handle one and two step instructions and should avoid complex tasks, this finding was similar to ALJ Jones' conclusion that she can do unskilled work that does not require her to follow detailed instructions.[6] And while ALJ Musseman concluded that Plaintiff required minimal supervision and

---

[6] *See* 20 C.F.R. § 404.1568(a) (defining "[u]nskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time").

should have no contact with members of the general public rather than occasional contact, ALJ Jones' decision not to incorporate these limitations is adequately supported by the record.

Plaintiff's abilities to provide childcare and housecleaning services, to drive herself to appointments and to the store, to drive her daughter to school, to handle the family's finances, to be independent in her personal care, and to perform household chores without assistance, support a determination that Plaintiff does not require even minimal supervision. (Tr. 87-101, 159 ). The record also shows that Plaintiff got along with her father, got along well with others, maintained contact and socialized with her sister and friends, and attended AA meetings for socialization. She was pleasant and cooperative in her interview with Dr. Forrer and records from her day treatment program showed she was often cooperative, receptive, and talkative. (Tr. 290-92, 297, 299, 305). This evidence reasonably credits ALJ Jones' finding that Plaintiff would need limited contact with members of the general public but not be totally isolated from them.

### D. RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 16) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 14) should be **DENIED** and her Complaint **DISMISSED.**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2)

of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 4, 2006                    s/ Mona K. Majzoub
                                                  **MONA K. MAJZOUB**
                                                  **UNITED STATES MAGISTRATE JUDGE**

### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 4, 2006                    s/ Lisa C. Bartlett
                                                  Courtroom Deputy